# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: ) | |
| ) | Case No. 19-44433 |
| GRASSO BROS. LAND COMPANY, INC. ) | |
| dba ) | Chapter 11 |
| M & J LAND COMPANY, INC., ) | |
| ) | HONORABLE BARRY S. SCHERMER |
| Debtor. ) | |
| ) | |

## DECLARATION OF MARY GRASSO IN SUPPORT OF RESPONSE TO UNITED STATES TRUSTEE'S MOTION TO DISMISS OR, ALTERNATIVELY, TO CONVERT CASE TO CHAPTER 7 AND JOSEPH GRASSO'S JOINDER

Declarant Mary Grasso, for her Declaration, states:

1. I am over the age of eighteen (18) and competent to testify, I have personal knowledge of the facts set forth herein.

2. Prior to 2007, Grasso Bros Land Company ("GBLC") was owned by a Trust originally established by my father. The Trustees of the Trust were my two older brothers, Tony Grasso and Joe Grasso, both of whom are attorneys.

3. Tony ran GBLC following my father's death in 1988.[1]

4. In 2007, I discovered that Tony had pillaged GBLC, destroying a large portion of its value, including by:

    a. causing GBLC to pay our cousin, Joe Grasso, Jr. $10 Million cash plus approximately $10 Million in properties for his 49% of the shares of GBLC, which far exceeded the value of his interest in GBLC at the time;

---

[1] Although my cousin Joe was given the title of President in alternating years, without assuming responsibilities of the position.

b. causing GBLC to transfer the Warehouse Property into his own name without paying any consideration to GBLC and taking out a personal loan from the Reliance Bank secured by the Warehouse Property as evidenced by a Deed of Trust attached hereto as Exhibit 1 and incorporated;

c. causing GBLC to buy four bedroom homes, properties for strippers/former strippers in New Athens and Waterloo, Illinois and giving them furnishings, cars and numerous checks for thousands of dollars drawn on GBLC's account;

d. intentionally failing to pay taxes on properties owned by GBLC, including 3900 Union Road (for which I paid $400,000 in taxes and GBLC later sold for $3.6 Million) and 3934-70 Union Road (the 12,000 square foot office building), 12 later sold for $550,000, so that the properties would be sold at tax sales and his friends could purchase the properties at below market prices, see Exhibit 2 attached and incorporated; at the same time taxes went unpaid, Tony Grasso caused thousands of dollars to be paid to Grimes Engineering and an architect regarding development of the same properties;

e. using GBLC funds to refund personal loans he took out from the GBLC SEP account in the amount of $200,000 per year for several years;

g. causing GBLC to sell property adjacent to the Warehouse Property and then granting the buyers an easement over the Warehouse Property that would have blocked trucks from driving up to the docks at the Warehouse Property, causing the affected tenant to seek damages from GBLC (which I was able to fix, see below);

h. causing GBLC to lease properties to tenants on terms highly unfavorable to GBLC, which severely limited GBLC's cash flow and depressed the values of the leased properties) (see list attached hereto as Exhibit 3 attached and incorporated).

7. I discovered Tony's pillaging of, and theft from GBLC in 2007 when I returned to St. Louis to investigate the status of GBLC after my Mom's death in 2006. Tony became angry at my request for a list of properties owned by GBLC and Tony started behaving erratically. At great personal risk,[2] I confronted Tony and was able to secure his agreement to leave management of GBLC and surrender all interests in the company. Joe Grasso had failed to participate in the investigation and only reluctantly, at my urging, came to St. Louis to confront Tony and facilitate Tony's removal from management of GBLC.

8. I agreed to take over as President of GBLC with the belief that I would have full support of Joe Grasso. At the time I took over, the company's records were incomplete; taxes were delinquent; and many GBLC properties not already transferred were burdened with unfavorable leases and I was under personal attack by Tony Grasso.

9. I was able to prevent total loss to GBLC of the value of the Warehouse Property on several occasions, including:

    a. when the primary tenant complained of leaks in the roof, I filed an insurance claim and then, when Peoples National Bank ("PNB") took all insurance proceeds, I loaned $250,000 to GBLC to foam the roof to fix the leaks and damage from water saturation in a 400,000 square foot section of the roof and obtain dismissal of a counterclaim the tenant had filed, asserting GBLC was responsible for the damage to the roof;[3]

    b. Subsequently, by filing a hail damage claim and obtaining $2 Million to replace the roof of the Warehouse Property, negotiating with PNB to allow the insurance

---

[2] Tony had made threats of harm to me, leading me to obtain several restraining orders and had to make numerous police reports.
[3] GBLC had alleged the tenant caused the damage when it installed HVAC units on the roof without consent of GBLC and failed to put sufficient flashing around the unauthorized HVAC units.

proceeds to be used for the roof replacement and overseeing the roof replacement for the property, a total tear off of the roof, took 6 months with two crews inside and one outside, which I oversaw, obtaining additional electrical work and reimbursement for damages by roofers.

c.  By discovering that the purchasers of property next to the Warehouse Property were about to "cut into" a critical portion of the Warehouse Property which would have prevented the primary tenant from accessing its loading docks without help from Joe Grasso and negotiating a resolution leaving undisturbed the drive to the loading docks;[4]

d.  By lending $50,000 to GBLC to pay PNB a forbearance fee to cancel a foreclosure sale of the Warehouse Property, to which payment Joe Grasso refused to contribute; and

e.  By lending GBLC the filing fees and retainer to seek relief under the Bankruptcy Code to prevent the sale through foreclosure of the Property that was scheduled in July and instead, pursue the fair market value sale of the Warehouse Property that was ultimately closed with approval of this Court, to which Joe Grasso again refused to contribute.

10.  In late 2009/early 2010, I reluctantly agreed to Joe's request for GBLC to take a loan in the amount of $3 Million from Peoples National Bank to fund distributions to Joe and me as shareholders, mine slightly in excess of $1.5 Million and his slightly less than $1.5 Million due to my ownership of more shares by agreement to the shareholder distribution was

---

[4] the adjacent property owner relied upon an easement to which Tony Grasso improvidently agreed.

contingent upon Joe Grasso's helping me save GBLC's problems, including by being present in St. Louis.

11. GBLC had severe cash flow issues including resulting from PNB's demands in early 2012 to pay down of its loans to GBLC and its changing of the terms of loans from interest only , requiring payments of $12,000 per month approx., to payments of principal and interest, requiring payments of $34,000 per month. Further, to service debt, in addition to my continuing to make loans when Joe refused, certain of the "better" properties with closer to market rate leases and better cash flow were sold, thereby decreasing income.

12. By early 2011, I was running GBLC without any salary or any assistance as prior employees had been let go due to lack of funds, and had loaned substantial funds to GBLC, including as set forth herein., leaving me to perform their jobs on numerous properties, including cleaning, repair and maintenance of properties, hereinafter, repair and working with contractors.

13. In January of 2012, I made urgent, desperate pleas to Joe Grasso to help me address GBLC's issues, including by lending back to GBLC much needed funds and to alleviate my impossible workload. Joe failed to respond to my requests.

14. In 2013, after Joe missed a noticed shareholder/director meeting to discuss possible Bankruptcy for GBLC, I noticed a shareholder meeting to elect directors and elected myself as director.

15. With respect to 3515 Union Road, I had negotiated a right of first refusal for an entity to purchase the property in consideration for funds drastically required to keep PNB from foreclosing on properties. Tony Grasso had discovered the right of first refusal and had contacted the prospective purchaser to convince it not to purchase the property. Further, the property had to be rezoned to be sold, which required a meeting on public notice. I caused a transfer of 3515

Union Road to Phase Transition so that any notice of the rezoning meeting would not reference GBLC, which I believed would result in Tony Grasso making efforts to prevent the rezoning.[5] The contract for sale that was negotiated specifically allows the property to be transferred to GBLC prior to closing of the sale.

16. In short, I have saved GBLC many times through my actions, at severe risk of harm and without compensation, and through lending funds to address issues, whereas, Joe Grasso has done neither.

17. Sales of remaining properties owned by GBLC will be at much higher prices if accomplished after dismissal of GBLC's Bankruptcy Case by a Trustee under the stigmas of Chapter 7 Bankruptcy. I have a commercial real estate broker's license (which I have had since 1987), have handled numerous sales and purchases of properties for GBLC, including as referenced herein, and now have the time and resources to devote to the sale of such properties especially since sale of the Warehouse Property, which took the majority of time previously.

18. GBLC stands ready to pay all valid claims and to resolve disputed claims through negotiation, mediation and/or litigation as necessary. GBLC, if permitted, will purchase certificates of deposit in the approximate aggregate amount of $1 Million, that it will cash and apply to payment of taxes after accountants are hired and tax liabilities are resolved.

19. Joe Grasso, a minority Shareholder, has no right to use the Bankruptcy filing to effectively remove me from management at great detriment to GBLC where I have worked tirelessly without compensation to save the economic value of the Company whereas, he paid

---

[5] Tony, in addition, filed numerous lawsuits against me and GBLC. See Exhibit 4 attached and incorporated.

nothing to prevent the foreclosure sales and contributed little time to solve the Company's problems. [6]

I verify under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.


Date: October 14, 2019

                                          */s/ Mary Grasso*
                                          Mary Grasso

---

[6] His delayed signature on a forbearance agreement caused loss of a contract to sell the warehouse property when the buyer heard at the noticed foreclosure sale that foreclosure was still possible.